

**FILED**

JUL 1 4 2004

LARRY W. PROPES, CLERK
CHARLESTON, SC

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| IUE-CWA, AFL-CIO, its Local 175, and JOHN LEVY, | ) ) ) | Case No. 3:01-4766-10 |
| Plaintiffs, | ) ) | |
| -vs.- | ) ) | |
| ENERSYS, INC., | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF SETTLEMENT

This is a proposed settlement of a class action certified under Rule 23, F.R.C.P. Order of

April 19, 2004. Under that Rule, the Court has the obligation to review the settlement agreement

to decide whether it is fair and adequate, in order to protect the interests of the class.[1]

Class and notice procedures

The agreement was reached between the plaintiff Union (which has been designated as a

class representative, as is permitted under the WARN Act) and the defendant Company, and has

also been approved by the individual plaintiff John Levy, who has also been designated as class

representative.

By Order of this Court, Settlement Services, Inc., a company specializing in

administering class actions, mailed individual notice to each class member describing the

---

[1]        As explained below, this WARN Act settlement is part of an overall settlement of
litigation between the Union and the Company. Although the other matters being settled are not
within this Court's direct jurisdiction, the Court is being informed of the overall settlement so it
can review the WARN Act settlement in full context.

settlement, the date and place of this hearing, and the procedure for opting out or objecting if

desired.  In addition, plaintiffs placed an advertisement in the Sumter Daily Item with a form of

the notice containing the essential information.  In addition, plaintiffs conducted a mass meeting

at a public school in Sumter, attended by approximately 200 people, where the settlement was

fully discussed, with numerous questions and comments.  Finally, the notices listed the telephone

number of plaintiffs' South Carolina counsel as well as a toll-free number maintained by

Settlement Services, Inc.  Hundreds of telephone calls were received at these two telephone

numbers, which afforded another opportunity for class members to be fully informed about the

proposed settlement.

      The periods for opt out (June 16, 2004) and objection (June 28, 2004) have closed and no

requests to opt out and no objections have been filed.

      Ten letters have been received by the Settlement Administrator from or on behalf of

former EnerSys employees who are not on the original class list but who believe they should be

included within the class.[2]  These letters are in response to class counsel's mailing of copies of

the notice to approximately 40 people who might possibly be in the class, informing them of the

opportunity to show they should be in the class.  As will be noted below, class counsel will

request that the settlement administration include a method for resolving such claims.

      <u>History of the case</u>

      The history of the case and the terms of the proposed settlement are described in the

Settlement Agreement and the Notice to the Class, and will be repeated here only briefly.

      On November 1, 2001, after a series of layoffs, the Sumter plant of EnerSys, Inc., was

---

[2]      Copies of these letters are being filed with the Court.

closed. On December 14, 2001, the plaintiffs brought this case as a class action, alleging that EnerSys had failed to give adequate notice of the layoffs and plant closing as required by the Workers Adjustment Retraining Notification Act (WARN Act), 29 U.S.C. § 2101. EnerSys, Inc., asserted that it had complied with the law and denied that the employees are entitled to any relief.

This case was only one of several controversies between the Union and the Company, involving every manner of forum -- court, NLRB, and arbitration.

After hotly contested litigation, the parties on November 22, 2003, reached written agreement on "Points of Settlement" of this case and the other outstanding litigation between them. On January 7, 2004, the settlement terms were incorporated in a "Global Settlement Agreement and General Release." This Court has jurisdiction only over the WARN Act, but since the settlement of the WARN Act case is part of an integrated settlement agreement, an outline of the settlement as it applies to the other litigation is presented here to provide full disclosure to the class members and to the Court in evaluating the terms of the proposed settlement.

<u>Description of the settlement</u>

The class representatives and class counsel believe that this settlement provides the class with full relief or nearly full recovery.

The WARN Act authorizes the following remedies:

1.   Backpay for the violation period of up to 60 days, calculated at the employee's final or highest average wage rate. 29 U.S.C. § 2104(a)(1)(A).

2.   Lost benefits including medical benefits for that period. § 2104(a)(1)(B).

3.   Reasonable attorneys' fees to be paid by the employer. § 2104(a)(6).

These remedies are afforded in the settlement as follows:

1.    Each class member will receive 340 hours' pay at their final or highest average wage. A majority of courts, including this district, have held that backpay is to be calculated for the number of workdays contained within the 60-day notice period rather than for 60 work days.[3] Based on a five-day week, that amounts to 42.5 days, or 340 hours.

2.    Each class member will receive $250 for lost medical benefits.

3.    The settlement includes an amount for attorneys' fees and expenses, subject to court approval.

The settlement provides another benefit not specifically provided in the statute:

4.    The class members' WARN Act amounts will be increased by 10% to reflect pre-judgment interest.[4]

Overall settlement totals

It is estimated that there are 400 members of the WARN Act class, and that their average wage is $9.70/hr. This produces the following estimated recovery:

| | | |
|---|---|---|
| Backpay | $1,325,000 | (400 people x $9.70 average wage x 340 hours) |
| Medical | 100,000 | (400 people x $250) |
| Interest | 140,000 | (10% of the above total) |

---

[3]    *Washington v. Aircap Industries, Inc.*, 860 F.Supp. 307 (D.S.C. 1994)(Norton, J.). The Fifth, Sixth, Eighth, Ninth and Tenth Circuits have all used the work-day computation. *Carpenters Dist. Council v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275 (5th Cir. 1994); Frymire v. Ampex Corp., 61 F.3d 757 (10th Cir. 1995); *Saxion v. Titan-C-Manufacturing, Inc.*, 86 F.3d 553 (6th Cir. 1996); *Breedlove v. Earthgrains Baking Companies*, 140 F.3d 797 (8th Cir. 1998); *Burns v. Stone Forest Industries, Inc.*, 147 F.3d 1182 (9th Cir. 1998). Only the Third Circuit uses the calendar-day interpretation. *United Steelworkers of America v. North Star Steel Co.*, 5 F.3d 39 (3rd Cir. 1993).

[4]    *Washington v. Aircap Industries, Inc.*, *supra*.

-4-

TOTAL     $1,565,000

As noted, this total is the class recovery.[5]  Attorneys' fees and costs are not coming out of this total.  The fees requested from the Court in this case (see separate Petition) amount to $500,000, with costs and expenses of $300,000.  As further described in the Petition for attorneys' fees, calculated as a common fund, the attorneys' fees are 24% of the fund ($500,000 out of $2,065,000).  Even if the fees and costs are combined, that is still less than 34 % of the fund ($800,000 out of $2,365,000).

Definition and composition of the class

Because of the structure of the Act, class counsel believe that all employees laid off for non-disciplinary reasons after April 16 but by November 7, 2001, were entitled to notice which they did not receive, and are thus eligible for WARN Act payments.  The different categories of employees are covered for somewhat different reasons.  Before explaining the details, here is a summary of the Act's coverage.

The WARN Act provides a detailed coverage formula.  29 U.S.C. § 2101.  This coverage formula includes two categories:  a "plant closing" resulting in layoff of 50 or more employees, and a "mass layoff" resulting in layoff of at least 50 employees who must constitute at least 33% of the plant.[6]

---

[5]     Appropriate deductions from settlement payments will be made for withholding.

[6]     Only employees with more than 6 months service are included in measuring whether and when a mass layoff or plant closing has occurred.  Shorter-time employees are called "part-time" and are excluded from the counts.  § 2101(a)(8).

When either of these events takes place, employees are entitled to 60 days notice beforehand. However, in measuring when a mass layoff or plant closing has taken place, the Act recognizes that layoffs are often spread over a number of days. Therefore the Act creates a 90-day window and includes all related layoffs that occur within that 90-day window in order to calculate whether the numerical floor for a mas layoff or plant closing has been reached. § 2102(d).

In this case, EnerSys began laying off short-time employees in March 2001, but these are not counted under the WARN Act for determining when a "mass layoff" occurs. Layoffs of regular employees began in April. Layoffs continued over the next several months, but it was not until July 16 that the total exceeded the 33% mark. Therefore, measuring back 90 days from July 16, 2001, means that all layoffs from April 16, 2001, were entitled to notice.

The layoffs break down into the following groups:

1.    The Company first issued WARN Act notices in May 2001 for layoffs scheduled during July 2001. However, it laid off covered employees after April 16 but before starting to give notice.

2.    The Company then began issuing notices, and issued 3 notices to the Union, as required by law, on behalf of employees in the bargaining unit. These notices may well have been valid as <u>mass layoff</u> notices,[7] but, as noted below, the laid off employees did not receive adequate notice of the plant closing.

3.    In June 2001, the Company withdrew recognition of the Union as bargaining agent, and thereafter sent no notice to the Union. During this lawsuit the Company originally contended that the withdrawal of recognition was lawful and that even if not, it sent notices directly to employees which was sufficient to satisfy the Act. Neither of these contentions is valid, so all employees laid off after the Company

---

[7]Plaintiffs alleged that the mass layoff notices were invalid because the Company in fact was already planning to close the plant – contrary to what the mass layoff notices said. This issue was never resolved because of the settlement.

stopped sending notices to the Union had their WARN Act rights violated.

4.    Finally, the Union should also have been given WARN Act notice of the plant closing, and the Company's failure to do so violated the WARN Act notice rights of all those who suffered an employment loss by the plant closing. This includes all employees laid off by the plant closing, and it also includes those employees (see paragraph 2 above) laid off in the previous 6 months who were still on layoff status and were entitled to notice -- through the Union -- of the plant closing as a separate employment loss.[8]

The above list covers all bargaining unit employees still employed after April 16, 2001. In one fashion or another all such employees are covered: those who were laid off before notices started going out, those who were laid off after the Company illegally stopped sending notices to the Union, those who were laid off by the plant closing, and even that group of people who may have received proper notice of a mass layoff but who should have but did not receive an additional notice of the plant closing.

Class counsel and the class representatives are pleased to have brought into the class virtually all employees truly affected by the mass layoff and plant closing, as opposed to picking and choosing who is covered.[9]

Related cases in the settlement

As stated above, settlement of the WARN Act case is part of an overall settlement of several cases between the Union and EnerSys . Although this Court's jurisdiction is over the

---

[8]    The Fourth Circuit has held that a mass layoff and plant closing are two separate employment losses. *Graphic Comm. Intl Union v. Quebecor Printing*, 252 F.3d 296 (4th Cir. 2001).

[9]    The main people not covered are those whose termination pre-dated the April 16 starting date, or stayed on after the plant closing, or who terminated voluntarily or were discharged for cause. The Act defines an "employment loss" as a termination other than a discharge for cause, a voluntary departure or retirement." § 2101(a)(6).

WARN Act, the additional details are provided so that the Court can evaluate the WARN Act settlement in context.

The total settlement amount of all the IUE-EnerSys litigation is $7,750,000. This amount covers (1) the WARN Act payments, (2) severance payments under the NLRB case, and (3) payments awarded by the arbitrator and upheld by the district court in the Gainsharing arbitration case. Pre-judgment interest is being included with each payment. In addition, some amounts will be allocated to attorneys' fees, tax liability and advice, and settlement administration. If any money is left undistributed, it will be given to charity.

The recipients of the WARN Act payments are described above, i.e., the members of the class certified by this Court. The recipients of the NLRB payments are those who were actively employed at EnerSys on April 16, 2001, and who were thereafter laid off for non-disciplinary reasons.[10] The recipients of the Gainsharing payments are those who were eligible under the Arbitrator's ruling, which covered approximately 650 employees in specific departments during the years 1998-2001.

The estimated breakdown is as follows:

---

[10] By coincidence this is essentially the same group of 400 as the WARN Act class, but for a different reason. The NLRB case mainly concerned the Company's failure (after expiration of the parties' collective bargaining agreement) to bargain over its decision to move all production from Sumter to its non-union plants and close the Sumter plant. Because the collective bargaining agreement was in effect until April 15, 2001, the NLRB settlement, which is essentially a severance benefit for the plant closing, applies to those who were still actively employed after the collective bargaining agreement expired. In addition, the NLRB had filed Unfair Labor Practice complaints on behalf of six named employees who it contended were fired discriminatorily for union activity, and for purposes of the settlement these "discriminatees" will be treated as if they had been laid off within the time frame. Thus, under the NLRB portion of the settlement, these six discriminatees will receive both the NLRB severance payments and (as part of the NLRB portion of the settlement) the WARN Act benefits.

| | |
|---|---|
| WARN Act + attorneys' fees and costs: | $2.35 million |
| Gainsharing | 1.25 million |
| NLRB | 3.35 million |
| Fees/expenses for non-WARN Act claims: | $ 300,000 |
| Additional tax + settlement expense: | 400,000 |
| Reserve for unforeseen claims | 100,000 |
| | |
| TOTAL | $7,750,000 |

The settlement gives up the possibility of forcing EnerSys to reopen the Sumter plant, but it provides that if the plant is reopened within five years, the Company is required to recognize the Union as the bargaining agent. The settlement also gives up an NLRB trial that could possibly have won more money than the settlement amount. However, class counsel carefully evaluated these issues and concluded that the possibility of reopening the plant or winning more money would be extremely difficult and problematic; in fact if the trial went forward the class would probably win less money than the settlement. In addition, both the WARN Act payment and the Gainsharing arbitration payment are essentially full payment on the claims in these cases. Finally, without a settlement there would be further delay and uncertainty of outcome.

Processing claims

Class members are not required to go through any onerous process to file or prove their respective claims. The class representatives and settlement administrator have identified likely class members and are estimating the amount due each.

To guard against errors, upon approval of the settlement the settlement administrator will send to each identified class member a notice advising of his or her amount as shown according to Company records. This notice will allow a class member to note any possible errors. Upon verification and signing of a narrow release, the settlement administrator will send the class

member his or her check.

For situations in which there is a question whether a person is or should be included within the class, the class representatives and class counsel recommend the following procedure: the claimant would be asked to present documentation supporting his or her claim. The settlement administrator would take all necessary steps to investigate the claim, including gathering or receiving information supporting or contradicting the claim, and would then make a report of findings. Any such report would be subject to ultimate resolution by the Court.

Conclusion

Settlements are to be measured both in absolute terms and in comparison to the prospects of further litigation. In absolute terms, this settlement provides full or nearly full compensation. The prospect of further litigation is that the same result would have been achieved, but perhaps with more delay, uncertainty, and effort required by the class members.

Therefore, named plaintiffs and class counsel request that the Court approve the settlement.

Respectfully submitted,

Armand Derfner #502
D. Peters Wilborn, Jr. #7609
DERFNER, ALTMAN & WILBORN, LLC
40 Calhoun Street, Suite 410
Post Office Box 600
Charleston, SC 29402
(843) 723-9804

Stephen M. Koslow
Counsel, IUE-CWA, AFL-CIO

-10-

1275 K Street NW, Suite 600
Washington, DC 20005
(202) 513-6342

ATTORNEYS FOR PLAINTIFFS

Charleston, South Carolina

July ___ 2004

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| IUE-CWA, AFL-CIO, its Local 175, and JOHN LEVY, | ) | Case No.: 3:01-4766-10 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs.- | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| ENERSYS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I hereby certify that the foregoing Plaintiffs' Memorandum in Support of Settlement has

been served upon the following counsel of record by placing same in the United States Mail,

postage prepaid, this _____ 14 _____ day of July, 2004, addressed to:

Vance J. Bettis, Esquire
Gignilliat, Savitz & Bettis, L.L.P.
900 Elmwood Avenue, Suite 100
Columbia, SC 29201

Paul R. Lewis, Esquire
Stevens & Lee
620 Freedom Business Center
Suite 200
Post Office Box 62330
King of Prussia, PA 19406

Christie Newman Barrett, Esquire
Assistant U.S. Attorney
Office of the U.S. Attorney
1441 Main Street, Suite 500
Columbia, SC 29201

Margery E. Lieber, Esquire, Assistant
General Counsel for Special Litigation
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570

041memoinsupportofsettlement.july1304.wpd